**SECOND DIVISION
RICKMAN, P. J.,
GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**July 2, 2025**

# In the Court of Appeals of Georgia

A25A0685. ADAMS v. FULTON COUNTY et al.

PIPKIN, Judge.

Appellant Julie Adams is a member of the Fulton County Board of Elections and Registration, a/k/a the Fulton County Board of Registration and Elections.[1] She

---

[1] Under Georgia's Election Code found in Chapter 2 of Title 21 of the Official Code of Georgia (OCGA § 21-2-1 et seq.), the proper designation for a county board such as this appears to be "board of elections and registration." See OCGA § 21-2-2 (35) (A). However, at some point the Fulton County Board of Elections and Registration apparently renamed itself the "Fulton County Board of Registration and Elections." That is the name used by the trial court (after first explaining why), and the name that appears on most of the numerous documents that appear in the record on appeal. Accordingly, we will also adopt this convention but shorten it to FCBRE.

filed a complaint for a declaratory judgment[2] seeking a declaration that the duties of the members of the FCBRE[3] related to the certification of election results are discretionary, not mandatory, and, further, for a separate declaration that FCBRE members are entitled to have "full access to [e]lection [m]aterials and [p]rocesses." After a "bench trial," the trial court entered an order declaring that Adams had a mandatory duty to certify election results and also declared that she was entitled, within certain limits, to non-protected election materials. Adams now appeals from this

---

[2] Adams named Appellee Fulton County, Georgia, as a defendant in her complaint, and the Democratic National Committee ("DNC") and Democratic Party of Georgia ("DPG") were allowed to intervene. Fulton County, the DNC, and the DPG will be collectively referred to as "Appellees."

[3] The General Assembly has authorized the creation of county boards of elections and boards of elections and registration, see OCGA § 21-2-40, and joint city-county boards of elections and boards of elections and registration, see OCGA § 21-2-45, to exercise the powers and duties of the election superintendent for their respective governmental entity. See also OCGA § 21-2-2 (35) (A). The FCBRE was created in 1989 and consists of five members. In this opinion, we also use the terms "member" of a board of elections and registration and "superintendent" interchangeably.

order. As more fully set forth below, we affirm in part and vacate and remand in part.[4]

Pertinent here, the record shows that Adams was nominated to the FCBRE by the Fulton County Republican party and, after being appointed by the Fulton County Board of Commissioners, was sworn in on February 8, 2024. In March 2024, five days before the Presidential Preference Primary ("PPP") was scheduled to be held on March 12, 2024, Adams sent a request to the then chair and director of the FCBRE requesting information pertaining to certain election materials and processes. Deeming the chair's response to her request inadequate, Adams subsequently voted against certification of the PPP election results. On March 29, 2024, the Democratic Party of Georgia sent a letter to the FCBRE emphasizing the mandatory nature of the certification of election results and pointing out the remedy of mandamus and possible misdemeanor penalties for failure to certify. Adams continued to communicate with the director of the FCBRE about her requested items, and, when a similar series of

---

[4] Adams has not separately enumerated as error the trial court's declaration concerning her entitlement to certain election materials. However, we find it necessary to vacate and remand this part of the trial court's order in light of recent precedent from our Supreme Court. See *Republican Nat. Committee v. Eternal Vigilance Action*, 2025 Ga. LEXIS 131, *61-62 (6) (C) (i) (Case No. S25A0362, decided June 10, 2025).

events played out for the May 2024 primary, Adams abstained from certification of those results.

Adams subsequently filed a complaint for a declaratory judgment, seeking a declaration that the duties of the FCBRE members related to certification are discretionary not ministerial[5] in nature and that the members are entitled to have "full access to [e]lection [m]aterials and [p]rocesses[.]" Following a bench trial, the trial court issued a series of declarations, first declaring that "[a]n election superintendent's role in certifying election results . . . is ministerial, even though many other aspects of her position are discretionary." The trial court clarified that the superintendent's role in certifying election results is "mandatory" regardless of the characterization of that act and, consequently, that "no election superintendent (or member of a board of elections and registration) may refuse to certify or abstain from certifying election results under any circumstance." The trial court added a footnote explaining that an elections superintendent or board member is not without recourse or a means to voice substantive concerns about an election outcome or process, noting

---

[5] Adams frames this issue as a ministerial task versus a discretionary one and the parties and trial court have followed that framework to an extent. However, as recognized by the trial court, "the debate is not so much about ministerial versus discretionary as it is about mandatory versus optional."

that the "tested mechanism" for addressing alleged fraud and abuse is to file an election contest as set out in OCGA § 21-2-522. The trial court also declared that, if an election superintendent or member of a board of elections and registration determines a need for election information in carrying out their duties, such information, if not protected from disclosure, "should be promptly provided. . . . However, any delay in receiving such information is not a basis for refusing to certify the election results or abstaining from doing so." Adams now argues that the trial court erred by ruling that certification of election results by an election superintendent or election board member is mandatory – meaning that they cannot refuse to certify or abstain from certifying – and that the trial court also erred in holding that OCGA § 21-2-522 is an adequate remedy in the event a superintendent finds fraud, error, mistakes or abuse before the deadline to vote on certification.

1. The answers to the questions presented here are found in the provisions of Georgia's Election Code ("Election Code"), see OCGA § 21-2-1 et seq., which, as recently observed by our Supreme Court "provide[s] in painstaking detail how elections are to be administered in Georgia." *Republican Nat. Committee v. Eternal Vigilance Action*, 2025 Ga. LEXIS 131 (Case No. S25A0362, decided June 10, 2025). Further, much of our analysis is controlled by our Supreme Court's recent opinion in

5

*Eternal Vigilance*, in which the Court, among other issues, considered the authority of the State Election Board ("SEB")[6] to promulgate certain rules; two of these rules – the Examination Rule and the Reasonable Inquiry Rule – mirror, in significant respect, the declarations that Adams requested in her complaint. For instance, the Examination Rule was crafted to permit superintendents to review "'all election related documentation' . . . at any time 'prior to the certification of election results.'" *Eternal Vigilance*, 2025 Ga. LEXIS 131 at 62 (6) (c) (i), quoting Ga. Comp. R. & Regs., r. 183-1-12-.12 (.1) (6). And the Reasonable Inquiry Rule states that to "certify" election results "means to attest, after reasonable inquiry that the tabulation and canvassing of the election are complete and accurate and that the results are a true and accurate accounting of all votes cast in that election." *Eternal Vigilance*, 2025 Ga. LEXIS 131 at *65-66 (6) (c) (iii), quoting Ga. Comp. R. & Regs., r. 183-1-12-.02 (1) (c.2).

These rules, as explained by the Supreme Court, "would allow local election officials to conduct a broad inquiry into election results, including by 'examining all

---

[6] There are many actors under our Election Code, including the Secretary of State, who acts as the chief state election official, see OCGA § 21-2-210, and the SEB, which is comprised of members appointed by the General Assembly and from each political party. OCGA § 21-2-30 (a), (c). Superintendents play an integral role on county and local levels, and they are required to perform numerous pre and post-election duties, see OCGA § 21-2-70.

election related documentation,' before certifying results, potentially permitting them to refuse to certify elections, even past statutory requirements, until the election official is satisfied that the results are 'complete and accurate.'" *Eternal Vigilance*, 2025 Ga. LEXIS 131 at *27 (2) (d). That is almost exactly what Adams sought to do in this case. However, as our Supreme Court explained in *Eternal Vigilance*, the SEB, as well as election superintendents, can only act "consistent with [the] law;" in other words, they must act within the confines of the governing statutory provision in the Election Code. *Eternal Vigilance*, 2025 Ga. LEXIS 131 at *61 (6) (c).

(a) In this case, the governing statutory provision is found in OCGA § 21-2-493,[7] which "outlines in detail the procedures the superintendent must follow before certifying election results[.]" *Eternal Vigilance,* 2025 Ga. LEXIS 131 at 67 (6) (c) (iii). Pursuant to subsection (a), "[t]he superintendent shall, after the close of the polls on the day of a primary or election, . . . publicly commence the computation and canvassing of the returns [and u]pon completion . . . shall tabulate the figures for the entire county or municipality and sign, announce, and attest the same, as required by

---

[7] This is also the statutory provision our Supreme Court examined in *Eternal Vigilance* to determine whether the Examination Rule and the Reasonable Inquiry Rule were consistent with, and thus authorized by, the Election Code.

this Code section." However, pursuant to subsection (b), before the superintendent computes the votes in any precinct, the superintendent

> shall compare the registration figure with the certificates returned by the poll officers showing the number of persons who voted in each precinct or the number of ballots cast. If, upon consideration by the superintendent . . ., it shall appear that the total vote returned . . . exceeds the number of electors in such precinct or exceeds the total number of persons who voted in such precinct or the total number of ballots cast therein, such excess shall be deemed a discrepancy and palpable error and shall be investigated by the superintendent. . . . The superintendent shall then examine all the registration and primary election documents whatever relating to such precinct . . . . Such examination may, if the superintendent deems it necessary, include a recount or recanvass of the votes of that precinct and a report of the facts of the case to the district attorney where such actions appears warranted.

Thus, under the plain language of the statute, the superintendent's document review is limited "to only those occasions on which the total votes exceed the total number of electors, voters, or ballots and also limits that review to only those documents 'relating to' the precinct" for which such a discrepancy has been detected." *Eternal Vigilance*, 2025 Ga. LEXIS 131 at \*62 (6) (c) (i). Accordingly, to the extent the trial court's declaration concerning a superintendent's entitlement to

8

"election information" can be read to allow review of election documents outside the confines of OCGA § 21-2-493 and the Supreme Court's holding in *Eternal Vigilance*, it must be vacated and reconsidered.

(b) A superintendent's duty to certify is equally clear under the statute. Although, as set out above, the superintendent is required to conduct an investigation in the event of certain discrepancies, OCGA § 21-2-493 (i) makes plain that "[u]ltimately, even if the superintendent discovers any error or fraud in the computation of votes, the superintendent '*shall* . . . certify the votes.' OCGA § 21-2-492 (i)."[8] (Citation and punctuation omitted; emphasis in original.) *Eternal Vigilance*, 2025 Ga. LEXIS 131, at 67 (6) (c) (iii). Additionally, subsection (k) of OCGA § 21-2-493 also speaks directly to, and imposes a deadline for, certification by the superintendent.

> As the returns from each precinct are read, computed, and found to be correct or corrected as aforesaid, they *shall* be recorded on the blanks prepared for the purpose until all the returns from the various precincts which are entitled to be counted *shall* have been duly recorded; then they

---

[8] OCGA § 21-2-493 (i) provides:"If any error or fraud is discovered, the superintendent shall compute and certify the votes justly, regardless of any fraudulent or erroneous returns presented to him or her, and shall report the facts to the appropriate district attorney for action."

*shall* be added together, announced, and attested by the assistants who made and computed the entries respectively and *shall* be signed by the superintendent. *The consolidated returns shall then be certified by the superintendent in the manner required by this chapter. Such returns shall be certified by the superintendent not later than 5:00 P. M. on the Monday following the date on which such election was held and such returns shall be immediately transmitted to the Secretary of State.*" (emphasis supplied.)

The word "shall" appears seven times in subsection (k) and it appears three times in the two sentences at the end of the subsection that specifically apply to certification by the superintendent. As the Supreme Court emphasized in *Eternal Vigilance*, 2025 Ga. LEXIS 131, at*67 (6) (c) (iii), "[t]he word 'shall' is generally construed as a word of command. The import of the language is mandatory." (Citation and punctuation omitted.) *Hall County Bd. of Tax Assessors v. Westrec Properties*, 303 Ga. 69, 75 (3) (809 SE2d 780) (2018). Based on the foregoing, Adams' contention that the trial court erred by declaring she had a mandatory duty to certify election results is without merit. See *Eternal Vigilance*, 2025 Ga. LEXIS 131, at *67 (6) (c) (iii) ("[a]llowing election officials to delay certification to conduct an undefined 'reasonable inquiry' into the validity of the results is incompatible with the clear requirements of OCGA § 21-2-493.").

2. Adams separately enumerates as error the trial court's "holding" that filing an election contest under OCGA § 21-2-522 "is a sufficient and proper remedy for Appellant if she finds fraud, error, mistakes or abuse[.]" However, the trial court made no declaration to the effect that filing an election contest was a sufficient and proper remedy. Rather, the trial court pointed out, in a footnote, that an election superintendent who suspects fraud or errors in election returns is not without recourse or a means to voice substantive concerns. Additionally, the statute imposes a mandatory obligation on the superintendent to "report the[se] facts to the appropriate district attorney for action." OCGA § 21-2-70 (i).

In sum, a superintendent is empowered to request and review election documents as outlined in OCGA § 21-2-493 and to share concerns about fraud or errors with the appropriate authorities. However, these concerns are not a basis for a superintendent to partially or entirely refuse to certify election results by the deadline. Rather, superintendents have a mandatory duty to certify all election results, as corrected.

*Judgment affirmed in part and vacated in part, and case remanded with direction. Rickman, P. J., and Gobeil, J., concur.*